32 A.3d 571 (2011)
423 N.J. Super. 309
STATE of New Jersey, Plaintiff-Appellant,
v.
Nicole M. HOLLAND, Defendant-Respondent.
State of New Jersey, Plaintiff-Respondent,
v.
Kenneth S. Pizzo, Jr., Defendant-Appellant.
Docket No. A-4384-09T3, A-4775-09T3
Superior Court of New Jersey, Appellate Division.
Argued February 8, 2011.
Decided December 20, 2011.
Remanded April 5, 2011.
Re-argued November 7, 2011.
*572 Monica do Outeiro, Assistant Prosecutor, argued the cause for State of New Jersey, appellant in Docket No. A-4384-09T3 and respondent in Docket No. A-4775-09T3 (Peter E. Warshaw, Jr., Monmouth County Prosecutor, attorney; Ms. Outeiro, of counsel and on the brief).
John Menzel, Point Pleasant, argued the cause for appellant Kenneth Pizzo, Jr.
Alexander M. Iler argued the cause for respondent Nicole Holland (Law Offices of Alexander M. Iler, Red Bank, attorneys; Mr. Iler, on the brief).
Before Judges PARRILLO, ALVAREZ and SKILLMAN.
The opinion of the court was delivered by
PARRILLO, P.J.A.D.
We had granted leave to appeal in these two matters (Holland and Pizzo) to resolve a common issue: whether blood *573 alcohol concentration (BAC) results derived from an Alcotest 7110 MKIII-C (Alcotest) breath-testing device are admissible against defendants in driving while intoxicated (DWI) prosecutions when the device has been calibrated with a Control Company, Inc. (Control Company) digital thermometer, instead of the Ertco-Hart digital thermometer referenced in State v. Chun, 194 N.J. 54, 89, 135, 152-53, 943 A.2d 114, cert. denied, 555 U.S. 825, 129 S.Ct. 158, 172 L.Ed.2d 41 (2008). State v. Holland, 422 N.J.Super. 185, 27 A.3d 1212 (App.Div.2011). We held that the "Ertco-Hart references in Chun are merely identifiers explaining the necessary firmware modifications and foundational documents required with respect to one [digital thermometer,]" id. at 196, 27 A.3d 1212, and therefore "the use of another manufacturer's [digital thermometer] to calibrate the Alcotest does not alone compel exclusion of test results. . . ." Id. at 197, 27 A.3d 1212.
Because "the State still bears the burden of demonstrating `the proper working order' of the device[,]" id. at 197, 27 A.3d 1212, and because questions were raised "[b]ased upon the foundational document itself," id. at 198, 27 A.3d 1212, we remanded the consolidated cases "for a hearing before a single judge to be designated by the Assignment Judge of Monmouth County to establish the reliability of the Alcotest results and the validity of the Traceable Certificate of Calibration for Digital Thermometer at the time of the Alcotest's calibration in each case." Id. at 200, 27 A.3d 1212. Specifically, the remand court was asked to determine "whether and how the differences in the [digital thermometers] had any impact at all" on the performance of the singular function required, namely to accurately read and report the temperatures of the simulator solutions during the Alcotest calibration process, id. at 198, 27 A.3d 1212; whether the Control Company certificate suffers from any "facial irregularity" that would render the use of its digital thermometer improper, id. at 199, 27 A.3d 1212; and whether the Alcotest calibrations at issue in both cases occurred during the period of time covered by the certificate for the digital thermometer used, id. at 199-200, 27 A.3d 1212.
On remand, the Law Division conducted a three-day hearing during which it heard expert testimony adduced by the State on the comparability of the Control Company and Ertco-Hart digital thermometers and the validity of the Control Company's certificate establishing National Institute of Standards and Technology (NIST) traceability. Following that hearing, the judge, in a thorough, detailed and well-reasoned sixty-seven page written decision, concluded that the Control Company digital thermometer is comparable in all material respects to the Ertco-Hart digital thermometer previously used during the Alcotest calibration process; that the Control Company certificate is facially valid, establishes NIST traceability comparable to the Ertco-Hart certificate, and satisfies the requirements as a foundational document as required in Chun; and that the calibration of the Alcotests in the Holland and Pizzo matters were both completed within the two-year period of the thermometer's certification. These findings, in which we concur, find ample support in the facts and law.
The procedural and factual background of these matters was set forth in our earlier opinion and need not be repeated here save for a brief description of the calibration process, through which a breath test coordinator certifies that an Alcotest is in proper working condition. The calibration process involves the running of three sets of tests, which results in the printing of three reports: the Calibration Record, the Part I Control Test, and the Part II *574 Linearity Tests. Prior to commencing these tests, the testing coordinator will prepare several alcohol solutions. The first is a 0.10% alcohol solution for the control test. The others are 0.04%, 0.08% and 0.16% alcohol solutions for the linearity tests. Each of these solutions must be heated to 34.0 degrees Celsius (plus or minus 0.2 degrees), the average range of human breath, which will create vapors that approximate human breath and provide for successful calibration. To do so, the coordinator will allow each solution to heat for approximately one hour and then ensure that they have reached the appropriate temperature using an external NIST-traceable[1] temperature probe.
As noted, a Control Company digital thermometer was utilized during the calibration of the separate Alcotests which yielded the BAC results at issue here. The Control Company digital thermometer was used to measure the temperature of the various simulator solutions as part of the control and linearity tests during the respective calibrations of the Alcotests in Neptune City (Holland) and Sea Girt (Pizzo). The Control Company digital thermometers are employed for the sole purpose of insuring that the temperature of the various simulator solutions is 34.0 degrees Celsius at the time the control and linearity test portions of the calibrations process are conducted. There is a permissible tolerance of 0.2 degrees Celsius. As such, the temperature of the various simulator solutions used during the various stages of the calibration process must be between 33.8 and 34.2 degrees Celsius. After confirming a simulator solution is at the correct temperature, the coordinator turns the digital thermometer off, removes it and returns it to its padded plastic container.
Once the coordinator has determined that the alcohol solutions have reached their appropriate temperatures, the coordinator will begin the actual calibration process, which, we emphasize, does not involve the Control Company probe. First, the coordinator will gain access to the Alcotest with the coordinator's black key temperature probe and conduct a control test with the 0.10% simulator solution. Upon completion of this process, the Calibration Record is printed. If the results of this test are not within the requisite range, the Alcotest will prompt the coordinator to repeat the control test with a new 0.10% simulator solution. If, on the other hand, the results are acceptable, the Part I Control Test certificate is printed. This document records the temperature of the 0.10% simulator solution as measured during the testseparate from the temperature recorded by the coordinator with the Control Company, or Ertco-Hart, digital thermometer during pre-calibration preparations. Chun, supra, 194 N.J. at 106 n. 24, 943 A.2d 114.
The coordinator will then conduct two linearity tests on each of the three different simulator solutions of 0.04%, 0.08% and 0.16% by again using the coordinator's black key temperature probe and the Alcotest's internal thermometer. If the results of the linearity tests are not acceptable, the Alcotest is placed out of service. If, on the other hand, the results are acceptable, *575 the Part II Linearity Tests certificate is printed. Also contained on this certificate are the temperatures of the three solutions as measured during the testagain separate from that measured by the Control Company digital thermometer during pre-calibration preparations. Lastly, the coordinator uses a solution to generate a Solution Change Report, which will complete the calibration test sequence and print a calibration report.
Against this background, at the remand proceeding, Dr. Howard J. Baum, who is the Director of the New Jersey State Police's Office of Forensic Sciences and who qualified without objection as an expert in the State's Breath Testing Program and in scientific measurement, first explained the process of replacing the Ertco-Hart digital thermometer. According to Baum, the replacement needed to satisfy several requirements including that the instrument provide a precise temperature, with an accuracy of at least 0.01 degrees Celsius between the freezing and boiling points of water"0.0 to 100.0" degrees Celsius[2]; be traceable to the NIST to ensure that the thermometer would give an accurate result; be calibrated properly by a laboratory that was accredited and complied with international standards for the calibration of thermometers, to ensure both external and independent inspections of the laboratory; and useable only for an Alcotest calibration during the period between its "calibration date" and its "calibration due date" (i.e., the date on which the calibration of the digital thermometer expires). Baum concluded that the Control Company thermometer satisfied all these requirements and no evidence to the contrary was adduced by defendants Holland and Pizzo.
Dr. Baum also compared the relevant characteristics of the Control Company and Ertco-Hart thermometers and identified the differences between the two, ultimately concluding that they are comparable in all material aspects and identical in the performance of the singular function required. They both accurately read and report the temperatures of the simulator solutions during the Alcotest calibration process. In this connection, differences in size, weight and power source actually favor use of the Control Company thermometer, which is easier to use, smaller, more portable and does not require a nearby electrical outlet. Most significant, there is no meaningful difference in accuracy. In fact, conditions identified as having the potential to affect accuracy of both instruments are almost identical. Moreover, no evidence was presented that the digital thermometers operate differently under divergent ambient humidity conditions.
On this score, "accuracy" is determined by how close a temperature reading is to what it actually should be. The accuracy for the Control Company thermometer, as noted, is to one hundredth (0.01) of a degree Celsius. While the Ertco-Hart digital thermometer is more "accurate," namely, to six thousandths (0.006) of a degree, the difference in accuracy is not scientifically significant for purposes of Alcotest calibrations because the breath test coordinators measure in tenths of a degree, and not in the thousandths of a degree.[3]
*576 Lastly, no evidence was adduced that the difference in the calibration time periods had any impact on the operation or accuracy of the thermometers. The Ertco-Hart digital thermometer requires calibration annually whereas the Control Company device is calibrated every two years by an accredited scientific laboratory that makes this determination based on available information and is subject to inspection, analysis and examination as part of the accreditation process.[4] In any event, here the calibration of the Alcotests in the Holland (May 26, 2009) and Pizzo (March 6, 2009) matters took place within one year of the calibration of the Control Company digital thermometer (November 18, 2008).
We are satisfied that sufficient credible evidence supports the Law Division's finding that the two digital thermometers are substantially equivalent in all respects necessary to the performance of their singular functions. The differences noted are neither scientifically significant nor relevant to the use of the thermometer in the Alcotest calibration process.
Having found comparability, the Law Division then considered whether the Control Company's Traceable Certificate of Calibration constituted a proper foundational document for the calibration of its digital thermometers, as required by Chun. Based on the undisputed expert proofs, the court found that the Control Company certificate "provides substantially more . . . relevant information [than the Draeger Certificate] regarding the calibration process, the `due dates' for the equipment used during the calibration process and other pertinent scientific data. . . ." For instance, the Draeger certificate makes no representation as to an accreditation of Draeger at all and thus it cannot be determined on its face whether the one-year period for the certification of the Ertco-Hart thermometer is supported by the scrutiny and independent approval that accreditation provides. In contrast, the Control Company certificate confirms that Control Company is accredited as a calibration laboratory. The certificate also establishes that the Control Company digital thermometer was calibrated prior to its use in the calibration of the Alcotests in the Holland and Pizzo matters and prior to its expiration date, in other words, while the certificate was valid and effective. Moreover, the remand court found no "facial irregularity" on the certificate that would render use of the Control Company digital thermometer improper, as claimed before the municipal court in the Holland matter.
Most significant, the certificate, labeled a "Traceable Certificate of Calibration. . .," establishes that the Control Company digital thermometer at issue here was calibrated with instruments traceable to NIST, a characteristic it shares with the Ertco-Hart digital thermometer and which is the only "discernable characteristic" emphasized by the Chun Special Master in his findings and conclusions. Holland, *577 supra, 422 N.J.Super. at 194-96. Yet despite its comparability to the Draeger certificate found acceptable in Chun, defendants contend that to prove the validity of the Control Company certificate, the State must also demonstrate that the measurements made by the digital thermometer are NIST traceable in accordance with requirements listed, described and published on a May 13, 2011 website admitted into evidence in the remand proceeding. Chun, however, imposes no such obligation on the State. On the contrary, the singular requirement imposed upon the State by Chun with regard to the Ertco-Hart digital thermometer was the production, as a foundational document, of the "Draeger Safety Ertco-Hart Calibration Report" during discovery. Chun, supra, 194 N.J. at 153, 943 A.2d 114. That document certified the digital thermometer had "been tested for accuracy with instrumentation that is traceable to" the NIST, and contains no representation that its measurements were NIST traceable. The Control Company certificate provides an identical certification, representing that the digital thermometer "was calibrated using Instruments Traceable to National Institute of Standards and Technology."
Simply put, the Chun Court did not require a certificate representing that the digital thermometer's measurements were NIST traceable. Defendants' attempt to import and apply a website's definition of "NIST traceable measurements" fails as it seeks to impose a burden on the State beyond the production in discovery of the certificate of calibration required by Chun. Nor does Chun require, as defendants suggest, production of documentation proving the underlying NIST traceability of the instruments used by Control Company to calibrate its digital thermometer. Chun, supra, 194 N.J. at 144, 943 A.2d 114 (noting that the "temperature probe documents" document "tests of tests"); see also State v. Maure, 240 N.J.Super. 269, 283, 573 A.2d 186 (App.Div.1990) ("Beyond such tests lie tests of the devices used to test other measuring devices. These tests must end somewhere. . . . We do not doubt defendants' sincerity in attacking the adequacy of these procedures. However, the oft-heard layman's opinion that the enforcement of the law can be frustrated by a `legal bag of tricks' must not be encouraged by slavish adherence to hyper-technical requirements of myriad testings"), aff'd, 123 N.J. 457, 588 A.2d 383 (1991).
Lastly, defendant Holland contends for the first time on this appeal after remand that the State's decision to switch to the Control Company digital thermometer was made without the "careful consideration" required by N.J.A.C. 13:51-3.2. Not only was this issue never raised below and therefore not reviewable on appeal, Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973), it is also without substantive merit, Rule 2:11-3(e)(1)(E), inasmuch as the internal action of the State Police in procuring instruments peripheral and incidental to breath testing devices does not constitute rulemaking that is subject to the provisions of the administrative code. See State v. Garthe, 145 N.J. 1, 7-8, 678 A.2d 153 (1996); State v. Cleverley, 348 N.J.Super. 455, 460-61, 792 A.2d 457 (App.Div.2002).
In conclusion, we are satisfied that sufficient credible evidence supports the remand court's findings that the Control Company digital thermometer is comparable in all material respects to the Ertco-Hart digital thermometer previously used during the Alcotest calibration process, and that the Control Company certificate is facially valid and satisfies the requirements as a foundational document as required by Chun. Accordingly, we reverse the order of the Law Division in *578 the Holland matter suppressing the Alcotest results for failure to provide a Draeger certificate as a requisite foundational document. We affirm that portion of the Law Division's order in the Pizzo matter holding that the Alcotest results are not inadmissible solely because the State used a Control Company digital thermometer. We remand both matters to the Law Division for further proceedings consistent with this opinion.
Affirmed in part; reversed in part; and remanded for further proceedings consistent with this opinion.
NOTES
[1] The Court in Chun required production of a Draeger Safety, Ertco-Hart Digital Temperature Measuring System Report of Calibration, NIST-traceability as a foundational document certifying the reliability of the temperature probe used to ensure the appropriate temperature of the solutions prior to the commencement of calibration of the Alcotest machine. 194 N.J. at 135, 943 A.2d 114. The Court, however, did not require its admission into evidence because the document is "not fundamentally a part of demonstrating that the particular device was in good working order." Id. at 144-45, 943 A.2d 114.
[2] While the calibration of the Alcotest permitted a range for the simulator solutions of between 33.8 to 34.2 degrees Celsius, Baum required that the replacement thermometer read to the one-hundredth of a degree. This would enable it to distinguish between, for example, 33.99 degrees and 34.00 degrees.
[3] As noted, the breath test coordinators utilize a permissible range of 33.8 degrees to 34.2 degrees when taking the temperatures of the simulator solutions. As a result, it is irrelevant if the temperature might be at 33.806 degrees (which could be determined with accuracy by the Ertco-Hart digital thermometer) or 33.80 degrees (which can be determined with accuracy by the Control Company digital thermometer).
[4] The reliability and accuracy of the Control Company digital thermometer was established by testimony setting forth its calibration by an accredited laboratory, which is regularly evaluated on the quality of its procedures, personnel, and work product in accordance with international standards. Accreditation of a manufacturer's laboratory is regularly relied upon by scientists, providing assurances of accuracy and reliability of the scientific equipment purchased without the need for time-consuming personal investigation. It is this accreditation that assured Baum and the coordinators that the Control Company digital thermometer will maintain its calibration for two years, as represented by the manufacturer.